UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Miles LaCross,

       Plaintiff,

v.                                                          Civil No. 10-3922 (JNE/LIB)
                                                            ORDER
City of Duluth, Officer Anton Marc,
Lt. Dan Chicos, Unknown/Unnamed Police
Officers of the City of Duluth,

       Defendant.

      Plaintiff Miles LaCross ("LaCross") brought suit against Defendants Officer Anton Mark

("Mark"),[1] Lieutenant Dan Chicos ("Chicos"), and the City of Duluth, alleging constitutional

violations under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and state common law claims.[2]  The

Defendants moved for summary judgment on all claims.  At the hearing held on May 10, 2012,

the Court dismissed the claims against Lieutenant Chicos, the § 1983 Monell claim against the

City of Duluth, and the § 1985 conspiracy claim—leaving only claims against Officer Mark

remaining.  For the reasons discussed below, the Court now grants summary judgment in favor

of Mark on the remaining claims.

## I.  BACKGROUND

      On September 17, 2006, an incident occurred between Duluth police officers and

LaCross.  In determining whether summary judgment is appropriate, a court must view the

evidence in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986); *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir.

---

[1]     The Complaint identified Officer Mark as "Anton Marc," an apparent spelling error that
was corrected at his deposition.

[2]     LaCross initially brought suit against a number of other defendants as well, who have
since been dismissed from the case.

2009).  Plaintiff and Defendants, however, recount vastly different and irreconcilable versions of the events that transpired during that encounter, so the Court provides each version separately below.

## A.  LaCross's Version of the Encounter

LaCross claims that around 6:00 p.m., or "late afternoon," on September 17, 2006, he was walking with his girlfriend to a party when a police officer stopped him.[3]  LaCross had been drinking alcohol and was intoxicated.  When he heard the police car pull up next to him, LaCross told his girlfriend to keep walking—he himself intended to run from the officer.  The officer— who LaCross described as a while male, around 30 or 40 years old with a medium build—got out of his car, at which point LaCross "took off running."  As he ran, he heard the firing of a Taser and then fell to the ground.  He claims that as soon as he opened his eyes, there were at least two officers on top of him, holding him to the ground and handcuffing him.  Once he was handcuffed, two officers carried him over to the squad car.  LaCross described one of these officers as an "Indian" having dark, almost black, hair and darker skin.  He did not remember much about the second officer, other than he was "white"—LaCross did not believe the officer was a "black cop."  According to LaCross, the officers "slammed" him into the squad car, "threw" him in and then walked away.

As he was sitting in the squad car, LaCross testified that he saw approximately seven or eight officers standing around—he believes there was one group of three officers who were standing closer to him, and another group of approximately four officers standing further away. The officers were smoking cigarettes, talking, laughing, looking at LaCross, and smiling.  It was

---

[3]        LaCross was uncertain about the date, but was certain that it was still daylight when the incident occurred.

still daylight while this was occurring.  LaCross testified that he got "pissed off" and began

yelling swear words at the officers, including racial slurs and threats.

After some time had passed, some of the officers returned to their squad cars and two

officers walked toward LaCross.  LaCross could not remember what either of these officers

looked like.  According to LaCross, one officer opened the rear driver's-side door, grabbed

LaCross's shirt, and "ripped [him] into the seat" so that his face was pushed into the seat.

LaCross testified that the other officer opened the rear passenger's-side door and tased LaCross

repeatedly from behind.  He claims he was tased multiple times, at least "more than twice," and

that he "kept falling in and out of consciousness."  LaCross then heard both front doors to the

squad car open and stated that both officers got into the car.  He testified that the officer driving

the car repeatedly slammed on the breaks to that LaCross would collide with the metal partition.

He then "passed out again."  LaCross recalls nothing more until he woke up in the hospital.

**B.  Defendants' Version of the Encounter**

The Defendant Officers in this case have very limited, if any, independent recollection of

the encounter with LaCross.  The version of the events described below is compiled from the

deposition testimony of the three officers involved in the encounter, the contemporaneous

Computer Aided Dispatch ("CAD") printouts,[4] Officer Mark's narrative report completed

immediately after the encounter, the Taser use form completed by Officer Mark, and the printout

of information downloaded from Officer Mark's Taser.

---

[4]     St. Louis County operates the emergency communications center and provides dispatch
services to the City of Duluth.  The CAD record is created by the County's dispatchers and the
City cannot alter these records.

Three officers were involved in the encounter with LaCross: Officer Mark, Lieutenant Chicos, and Officer Charles O'Connor.[5]  On September 17, Mark's shift began at 7:00 p.m.; Chicos' shift began at 6:00 p.m.; and O'Connor's shift began at 6:30 p.m.  Mark is an African-American male, 6 feet tall, and at the time of the incident, he weighed 260-270 pounds and had very short hair.  On September 17th, he was operating a marked squad car and was not working with a partner.  Chicos is a white male who is 6 feet tall, weighs 185 pounds, and has sandy brown hair and blue-green eyes.  On September 17, he was operating an unmarked police car and also was not working with a partner.  O'Connor was also working alone on September 17.

The CAD records indicate that at 1:53 a.m. on September 17, 2006, Mark initiated a call to the emergency communications center ("Center") advising the Center that he would be out of his squad car.  Nine seconds later, a Center employee changed the nature of the call from "out with" to "drunk people."  At 1:54 a.m., another Center employee entered Mark's advisory that an individual "ran away with tazer [sic] probes in his back."  At 1:55 a.m., a Center employee entered Mark's description of the individual as a white male with short blond hair.  At 1:56 a.m., an employee entered Mark's report that the individual "tried swinging at [Mark]."  At 2:00 a.m., Mark entered into CAD that a drunk male tried to hit him and missed, that the individual was tased and ran northbound on Fourth Avenue East, and that he was unable to locate the individual. The information downloaded from Mark's Taser indicates that the device was fired two times during this time period—the first time for a duration of 6 seconds, and a second trigger pull— which commenced immediately after the first firing ceased—for a duration of 5 seconds.[6]

---

[5]     Officer O'Connor is not a defendant in this case.

[6]     The Taser's internal clock slowly loses time between downloads, so the time stamps are somewhat inaccurate.  The first trigger pull was recorded at 1:50:42 a.m., which corresponds with the events Mark described at 1:54 a.m.  The six-second trigger pull indicates that the trigger

Chicos and O'Connor were dispatched to Mark's location at 1:54 a.m. O'Connor arrived at Mark's location, saw Mark, and began to search for LaCross. Chicos heard on the police radio that Mark had encountered two individuals and that after one of the individuals tried to hit Mark, Mark used his Taser and the individual ran from the scene. Chicos responded and drove his unmarked squad car to the area to help search for the individual. At 2:04 a.m., Chicos saw someone walking along the street who matched the description of the person Mark had described over the radio. Chicos also noted that the person had Taser probes hanging off the back of his body. He pulled over, exited his vehicle, and informed the individual that he was a police officer. The individual did not try to run and did not appear to Chicos to be belligerent, angry, loud, or obnoxious. Chicos approached within six feet of the individual and asked him for identification, at which time he learned that the individual was Miles LaCross. Chicos and LaCross waited for the other officers to show up. Chicos could not recall making any physical contact with LaCross and did not perceive LaCross to be a threat to him. Chicos does not believe that he handcuffed LaCross.

Mark arrived at Chicos' location at 2:05 a.m.—approximately thirty seconds to a minute later—and O'Connor arrived at 2:07 a.m. When O'Connor arrived, he saw LaCross standing near Chicos. O'Connor denied having any physical contact with LaCross. LaCross was handcuffed and Mark escorted LaCross over to Mark's squad car. Neither Chicos nor O'Connor approached Mark's car and neither had any recollection of events that transpired while LaCross was in Mark's car. Because Mark's car was parked some distance away from where Chicos was standing, Chicos testified that he was in no position to see into the back of Mark's car.

---

was pressed and held for six seconds. The five-second trigger pull, however, does not necessarily indicate that the trigger was held again for five seconds—the device runs up to five seconds simply by a press and release of the trigger.

According to Mark's report, while LaCross was in the rear of the squad car, he began to kick the windows of the vehicle and tried to bite Mark. At that point Mark used the Taser in stun-drive mode, contacting LaCross's upper back.[7] The information downloaded from the Taser indicates that 17 minutes after the first two trigger pulls, the Taser was fired a third time for a duration of three seconds—indicating that there was a manual press and release and that the device was manually shut off, consistent with the use of the device in stun-drive mode.

At 2:11 a.m. Mark began a transport to St. Luke's Hospital. No other officers were in Mark's vehicle. O'Connor followed Mark separately in his own squad car. Chicos waited until the scene was cleared before he left at 2:12 a.m. to respond to another call and did not accompany Mark to the hospital.

At 3:19 a.m., Mark entered the following information into CAD:

> MILES WAS TOOK TO LUKES DUE THE HIM VIOLENT
> BEHAVIOR. THE ER STAFF THEN RELEASED HIM SO HE
> COULD GO TO DTX [Detox] AS THE ODDS ARE THEY
> WOULDN'T HAVE TAKEN HIM BEFOR HIS VISIT TO LUKES.
> ONCE AT DTX STAFF STATED THEY COULNT ADMT HIM AS
> HE "GOT NOT HOLD HIS OWN HEAD UP" RETURNED HIM TO
> LUKES THE ER DOC STATED HE TALKED TO THE DTX STAFF
> PRIOR TO HIS TRANSPORT THERE AND COULDN'T
> UNDERSTAND WHY THEY WOULDN'T TAKE HIM AS THEY
> KNOW WHAT MEDS HE WAS GIVEN AND HIS STATE. MILES
> WAS LEFT AT LUKES.

On September 18, Mark completed a police report describing the encounter:

> On 09/17/06 at 0153 hours, I, Officer Mark (402), while on routine patrol
> in the area of Fourth Avenue East and Third Street, observed what I

---

[7]    In stun-drive mode, the Taser is applied directly to the subject's body, without deployment of the metal darts, causing pain but no neuro-muscular interruption. *Jones v. Clark*, Civil No. 10-510 (SRN/JJK), 2012 WL 388699, at *5 n.3 (D. Minn. Feb. 7, 2012); *Imp v. Wallace*, Civil No. 10-509 (DSD/JJK), 2011 WL 4396941, at *5 n.10 (D. Minn. Sept. 21, 2011). In contrast, a Taser in dart mode fires metal darts that penetrate the skin and causes neuro-muscular interruption, which can cause the subject to lose control of his muscles and fall down. *Jones*, 2012 WL 388699, at *5 n.3; *Imp*, 2011 WL 4396941, at *5 n.10.

believed to be two intoxicated underage people.  One was a female, the other was male, both of whom appeared to be over the age of 18 but under the age of 21.  I then stopped my vehicle and asked them how old they were. The female said she was 19 years old.  I then asked the male how old was he and it was at that time the male, later identified as MILES LYLE LACROSS, dob 11/13/85, then told me to go fuck off.  I then exited my patrol vehicle and it was at that time, being by myself, the female walked away and the male with whom I, again, asked for his I.D. told me to fuck off again.  While talking with the male, I noticed that he was standing with his left shoulder toward me and with his right hand I could see he was making a fist in it and also at that time he began to rub his nose.  Thinking that he was about to swing at me, I unholstered my taser and hid it behind my back.  While talking with LACROSS, he then made an attempt to hit me by swinging his right closed fist toward me.  It was at that time I stepped back, he swung and missed.  I deployed the taser which got tangled up in his shirt and LACROSS then ran away.

We searched for LACROSS.  He was found shortly thereafter by LT Chicos.  It was at that time that LACROSS was handcuffed and put in the rear seat of my patrol vehicle.  While LACROSS was in the rear seat of my patrol vehicle, he began to kick at the windows and made an attempt to bite me.  It was at that time I then gave LACROSS another stun with the taser, in his upper mid back which calmed him down prior to transporting him to St. Luke's Hospital where he was then sedated due to his level of intoxication. St. Luke's then released him where we took him to Detox. While at Detox they stated that he was too sedated to be there; therefore, we ended up transporting him back to St. Luke's where he was left in the custody of St. Luke's Medical Center.

## C.  Subsequent Medical Care and Detox

Mark and LaCross arrived at St. Luke's Hospital at 2:17 a.m.  The only thing LaCross recalls from this visit to the hospital is waking up in a white room with a "one-sided window." He was no longer handcuffed or restrained.  He testified that he sat up, ran head-first into the window, and "knocked [him]self out."  The emergency department's triage assessment indicated that LaCross was brought in by the police after he had been "found walking downtown, became belligerent with DPD."  Hospital records indicate his behavior was "impulsive, non-compliant, shouting, danger to self, pacing, threatening, danger to others, uncooperative, physically aggressive, verbally abusive."  His mood/affect was "paranoid, hostile," his speech pattern was

"excessive," his voice was "loud," his thought process was "distorted," and his impulse control was "poor."  He was diagnosed with "acute agitation" and "alcohol intoxication" and given a sedative to "get [him] under control before going to Detox."

Dr. Peter M. Stenehjem performed a physical examination on LaCross.  The medical record reveals that on exam, LaCross was an "[a]cutely intoxicated and agitated young male spitting on the walls and hitting the walls, fighting with the police.  He is very belligerent, loud, and disorderly."  Dr. Stenehjem also noted that LaCross had "a strong smell of alcohol on his breath" and had "a couple of marks of erythema on his back where they tasered him but the police said the Taser tip mainly got hung up in his shirt."[8]  The physician did "not see any dramatic trauma to his arms, legs, chest, or abdomen."  He was again described as "agitated, intoxicated, disorderly, [and] noncooperative."

LaCross was discharged around 3:00 a.m., at which time he was "drowsy" but "able to state his name [and] ambulate with minimal assistance."  Mark, followed again by O'Connor, transported LaCross to the Center for Alcohol & Drug Treatment ("Detox").  LaCross, however, was too sedate for the Detox protocol and at 3:13 a.m., the officers brought LaCross back to St. Luke's.  When LaCross arrived at St. Luke's, he was able to get out of the police car with "minimal assistance," was sedated, and responded to voice commands.  He "required no further intervention" and was monitored until he was discharged at 7:17 a.m. with a diagnosis of "alcohol intoxication."  He was then sent back to Detox, and was noted as being "verbally abusive toward staff as he was leaving ED to go to Detox."

When LaCross arrived at Detox by 7:30 a.m., no "current medical problems" were documented, and the records reflect that LaCross drank at least half a liter of vodka just prior to

---

[8]       "Erythema" is redness of the skin.

admission.  LaCross refused to answer questions and stated, "I'm [not] going to stay.  I'm

leaving [after] I eat."  During a physical examination, the only noted physical abnormality was

an abrasion on his left check.  LaCross denied loss of consciousness,[9] and refused a breathalyzer,

but his "degree of intoxication" was recorded as "obvious."  Detox records also indicate that he

had a history of blackouts from his alcohol use.

LaCross was placed on a 72-hour hold at Detox.  While at Detox, LaCross reported that

"he was injured by the police officers."  The records noted:

> Client stated he remembered being "Tazed" all over, "choked," and "beat"
> by the officers.  Client stated they (police) stopped him "for no reason"
> and he ran from them.  Client stated the police placed the cuffs "so hard"
> on his wrists that he was unable to move.  Client stated the cuffs they
> placed on his wrists left injuries.  Client stated his left hand is tingling and
> numb.  Client showed this writer "marks" on his wrists stating they were
> caused from the handcuffs. . . . Client . . . requested to go to the hospital
> due to his hand.  Client stated the nurse told him to call 911 and make a
> report.  Client stated the officer came to said facility (detox), but client
> declined to make a report due to fear of the police officers retaliating
> ("harassing him, looking for him").

Detox staff brought LaCross back to St. Luke's on September 18 with complaints of

numbness and tingling in his hands from the handcuffs.  LaCross testified, however, that he

believed he could escape if he went back to the hospital, and that it was his intention to "run

away from the hospital."  *Id.* at 182:5-10.  He "was just more so looking for a way to get out of

the hospital without anybody noticing me."  *Id.* at 183:4-5.  Medical records noted bruising on

LaCross's left wrist and that both wrists were tender.  Despite LaCross's complaints of "a little

bit of tingling sensation," his medical exam was unremarkable.  He was diagnosed with "bilateral

wrist contusions" from the handcuffs, advised that the pain and numbness should gradually

---

[9]      "LOC" is a commonly used medical acronym for "loss of consciousness."

improve, told to use ice and Tylenol for pain, and directed to follow up in seven to ten days if the symptoms had not resolved.

LaCross returned to Detox and was discharged on September 20, 2006. He has not sought further evaluation or treatment for his wrists, nor has he sought any medical or psychological care related to the use of the Taser.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party must substantiate his allegations by "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotation marks omitted).

**A. Excessive Force Claim under 42 U.S.C. § 1983**

LaCross asserts § 1983 claims against Mark in his individual and official capacity.[10]  42

U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State ... subjects, or causes to be subjected, any
> citizen of the United States ... to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law.

42 U.S.C. § 1983.  Because § 1983 is "not itself a source of substantive rights," a court

addressing a claim pursuant to § 1983 must "identify the specific constitutional right allegedly

infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  LaCross alleges that Mark violated his

right to be free from excessive force and unreasonable seizures.  Mark contends that he is

entitled to qualified immunity.  "Qualified immunity shields a government official from liability

and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated

a clearly established constitutional or statutory right of which a reasonable official would have

known." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) (citing *Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To defeat a claim of qualified immunity, a plaintiff

alleging excessive use of force must present sufficient facts to show that the officer's conduct

violated a constitutional right, and he must also establish that the constitutional right was clearly

established." *Id.*

*1. Deprivation of a Constitutional Right*

LaCross's claim that Mark violated his right to be free from excessive force and

unreasonable seizures is evaluated under the Fourth Amendment objective reasonableness

---

[10]     "A suit against a public employee in his or her official capacity is merely a suit against
the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)
(citing *Kentucky v. Graham*, 472 U.S. 159, 165 (1985)).

standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under this standard, the appropriate inquiry is whether the "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct." *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) (citations omitted).

Before the Court can address the reasonableness of the officers' use of force on LaCross, the Court must first determine which version of the facts to consider in its analysis. As defense counsel aptly noted, the difference between the Plaintiff's and Defendants' versions of the events is "literally the difference between night and day." "In qualified immunity cases," the court usually adopts "the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. at 380. Here, however, there is a serious problem with adopting the Plaintiff's account. If the Court takes LaCross's version of the facts as true for purposes of this motion, then the Court must grant summary judgment in favor of Mark because there is no evidence that the event LaCross described involved Officer Mark. LaCross asserts in his Amended Complaint that he was apprehended around dusk, and that "several hours" elapsed before he was brought to the hospital for medical treatment. The Court may, in fact, be bound by such an assertion. "[F]actual statements in a party's pleadings are generally binding on that party unless the pleading is

12

amended." *Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001) (citing *Mo. Housing Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990); *State Farm Mut. Auto. Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968)). "[A] party is bound by what it states in its pleading. . . . [A]lthough the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Knudsen*, 254 F.3d at 752 (quoting *Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997)). LaCross did not try to amend his pleading—rather, he confirmed his assertion during his deposition, when he testified that the encounter took place in the "late afternoon," which he believed was around six o'clock in the evening, when it was still daylight. The encounter between LaCross and Mark occurred around 1:50 a.m., in the wee hours of the morning when it was most certainly not still "daylight."[11] Mark was not on duty at the time LaCross alleges that he was subjected to excessive force and the record is devoid of any evidence that Mark had contact with LaCross during daylight hours, or at any time other than in the middle of the night. Taking LaCross's version of the encounter as true, there is no evidence showing that Mark was involved in the encounter, and so summary judgment in his favor would be warranted.

Even if the Court were to overlook the discrepancy regarding the time of day and whether it was daylight or dark, it is clear that LaCross described an entirely different event than that which occurred with the named defendants in this case. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties

---

[11]   With the consent of the parties, the Court takes judicial notice of the fact that on September 17, 2006, sunrise in Duluth was at approximately 6:50 a.m. and sunset was at approximately 7:20 p.m.

tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*  The vast majority of LaCross's version of the encounter is blatantly contradicted by the record.  First, LaCross described officers that do not match Mark's description.  It is undisputed that the officer who initially stopped LaCross on the street on September 17, fired a Taser, and from whom LaCross ran was Officer Mark.  But LaCross described this officer as a white male, around 30 or 40 years old with a medium build.  Mark is a large African-American male.  LaCross testified that after he was tased and fell face-down, at least two officers were on top of him, "holding [him] down and putting their weight on [him] as hard as they could."  Chicos and O'Connor, however, testified that they did not make physical contact with LaCross, and in fact, LaCross was simply standing near Chicos when Mark arrived to handcuff him.  The record indicates that Mark was the only officer to make physical contact with LaCross, and at no point was LaCross thrown to the ground in the manner he described.  LaCross described being carried to the squad car by two officers—at least one of whom was an "Indian," and the other officer who was *not* the "black cop."  The record indicates, however, that Mark was the only officer who escorted LaCross to the squad car.  There were no "Indian" police officers involved in the September 17 encounter.  LaCross described a crowd of approximately eight officers, in two groups, standing around during the encounter, smoking and smiling—but the record reveals that a total of only three officers were involved.  LaCross testified that two officers took part in the tasing incident in the squad car and that both officers were in the car when he was taken to the hospital—but the record unequivocally indicates that Mark was the only officer involved in the use of the Taser, and Mark was the only officer in the car during transport to St. Luke's.  LaCross asserts that he was tased repeatedly while in the back

of the squad car—at least twice—but the printout from Mark's Taser indicates that it was only fired once during the time that LaCross was in the car, and the medical records from St. Luke's revealed only a couple of red marks on his back, inconsistent with repeated tasing "all over." LaCross further alleged that the officers "delayed several hours" before bringing him to St. Luke's. The record blatantly refutes this assertion—the encounter began just after 1:50 a.m. and LaCross arrived at St. Luke's at 2:17 a.m., less than half an hour later. Finally, LaCross testified that he "kept falling in and out of consciousness," but the medical record from St. Luke's indicates that LaCross was agitated, aggressive, loud, and belligerent—not unconscious—and when at Detox, LaCross denied loss of consciousness.

When ruling on a motion for summary judgment, the Court need not adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Scott*, 550 U.S. at 380). "'A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor,' without resort to 'speculation, conjecture, or fantasy.'" *Id.* at 790-91 (citations omitted). Here, there is nothing in the record to support LaCross's allegations other than his own testimony. In contrast, the evidence submitted by the Defendants, including the deposition testimony of the three officers, the contemporaneous CAD record, Mark's narrative report filed a day after the encounter, the Taser use form and information downloaded from the Taser itself, and the contemporaneous medical records from St. Luke's and Detox, provide "'overwhelming evidence' to refute [LaCross]'s version of the events in question." *Id.* at 791. "Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to

'accept unreasonable inferences or sheer speculation as fact.'" *Id.* (citation omitted).  Given the

record in this case, no reasonable jury could credit LaCross's version of events.  *See id.*

(affirming the district court's grant of summary judgment in favor of the defendants where the

plaintiff's allegations of excessive force were based solely on his own deposition testimony,

which was contradicted by the rest of the record).[12]

Having found that no reasonable jury could credit LaCross's version of the events that

transpired on September 17, the Court turns to Mark's version of the encounter to determine

whether his use of force was unreasonable.  Mark asserts that he deployed the Taser after

LaCross, who was obviously intoxicated, swung his fist at Mark in an unsuccessful attempt to hit

him.  The Taser probes got tangled in LaCross's shirt and LaCross ran away.  When Chicos

found LaCross, Chicos and LaCross waited for Mark to arrive, at which point LaCross was

handcuffed and placed in the back of Mark's squad car.  LaCross began to swear and kick at the

windows and attempted to bite Mark.  Mark used the Taser one more time, this time in stun-drive

mode, to calm him down so that he could transport him to St. Luke's.  When LaCross arrived at

St. Luke's, he was still aggressive, agitated, and violent.

The Court finds that Mark's actions were "'objectively reasonable' in light of the facts

and circumstances confronting [him]."  *Graham*, 490 U.S. at 397 (1989).  "It is well-established

that 'the right to make an arrest or investigatory stop necessarily carries with it the right to use

some degree of physical coercion or threat thereof to effect it."  *Chambers*, 641 F.3d at 905

(quoting *Graham*, 490 U.S. at 396).  "Police officers undoubtedly have a right to use some

degree of physical force . . . to effect a lawful seizure, and reasonable applications of force may

---

[12]     At oral argument, Plaintiff's attorney even acknowledged that his client suffered from a "failure of recollection" because he was "so highly intoxicated," and urged the Court to ignore certain aspects of LaCross's own deposition testimony.

well cause pain or minor injuries with some frequency." *Id.* at 907 (citation omitted).  "It remains firmly established that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"  *Id.* (quoting *Graham*, 490 U.S. 396).  "Resistance may justify the use of greater force."  *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1008 (8th Cir. 2003).

The only action that LaCross appears to argue was excessive was Mark's use of the Taser when LaCross was in the squad car.[13]  LaCross was highly intoxicated, had already attempted to use force against Mark, and had then fled from the officer.  When he was apprehended and placed in the squad car, he began kicking at the windows and tried to bite Mark.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  An officer's use of a Taser is unreasonable when it is used against a nonviolent misdemeanant, who is not fleeing or resisting arrest, and who poses little threat to anyone's safety.  *See Shekleton v. Eichenberger*, No. 11-2108, 2012 WL 1537654, at *3 (8th Cir. May 3, 2012) (holding that the officer's use of a Taser was excessive when used against an "unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him"); *Brown v. City of Golden Valley*,

---

[13]     LaCross does not seem to argue that the application of handcuffs constituted excessive force.   To the extent that he does intend to make such a claim, it would also fail.  "'Handcuffing inevitably involves some use of force,' and it almost inevitably will result in some irritation, minor injury, or discomfort where then handcuffs are applied."  *Chambers*, 641 F.3d at 907 (citation omitted).  "To prove that the force applied was excessive in that context, therefore, a plaintiff must demonstrate something more."  *Id.*  Even claims of nerve damage or bleeding from being handcuffed too tightly fail to amount to excessive force absent any medical records indicating a long-term injury.  *See Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990); *Crumley*, 324 F.3d at 1008.  LaCross provided no evidence of long-term injury resulting from the handcuffs—at most, he suffered from bruises, for which he sought no further treatment after September 18.  Thus, Mark's application of the handcuffs did not amount to excessive force.

574 F.3d 491, 499 (8th Cir. 2009).  Although LaCross was handcuffed, he was continuing to

resist arrest, was threatening the officer, was behaving aggressively, and posed a threat to his

own safety as well as the officer's safety.[14]  Given the facts and circumstances confronting Mark,

it was not unreasonable to use the Taser once, in stun-drive mode, in order to subdue LaCross

and enable transport to the hospital.  Thus, Mark did not deprive LaCross of a constitutional

right.

### 2. *Clearly Established Right at the Time of Deprivation*

The only way the Court could even conceivably find that Mark's use of the Taser

constituted excessive force would be if the Court crafted its own composite version of the events

by patching together bits and pieces of the Plaintiff's and Defendants' stories.  The Court would

have to completely ignore LaCross's "failure of recollection" regarding the time of day he was

stopped, who stopped him, what happened when he was stopped, who tased him, how many

times he was tased, and what happened after he was tased—and would then have to credit only

that small part of LaCross's recollection from which he testified that he was not kicking or trying

to bite Mark at the time he was tased in the squad car.[15]  But even if the Court were willing to

engage in such a creative endeavor, there is still another step to the qualified immunity analysis.

---

[14]     Chicos testified that a person kicking at the squad car windows could not only damage the vehicle, but could cause harm to himself or the officer if the window broke—something he had seen happen before.  Chicos Dep. 75:23-76:10.

[15]     LaCross attempts to argue that Chicos' testimony confirms that LaCross was not kicking or biting at the time he was tased.  According to LaCross, Chicos stated that when someone is kicking at squad car windows, it is the type of thing he can tell is happening—and he did not observe LaCross kicking at Mark's windows.  But LaCross grossly misstates Chicos' testimony. Chicos actually testified that he was in no position to observe what occurred in Mark's squad car because the car was parked some distance away from him.  Chicos Dep. 72:14-73:7.  The testimony LaCross relies upon was related to Chicos' own experience apprehending intoxicated suspects who have kicked at the windows *of his own squad car*—in *those* cases, Chicos can tell that such conduct is occurring. Thus, this testimony does not support LaCross's assertion.

"The second step . . . is to determine whether the right that was violated was 'clearly established' at the time of the defendant's alleged misconduct." *Chambers*, 641 F.3d at 908. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A plaintiff "must establish that the unlawfulness was apparent in light of preexisting law," i.e., "whether the law at the time of the events in question gave the officers 'fair warning' that their conduct was unconstitutional." *Id.* (citation omitted). The events in question occurred in 2006. At that time, "it was clearly established . . . that an arrestee had a right to be free from the use of excessive force." *Id.* "It was not clearly established, however, that an officer violated the rights of an arrestee by applying force that caused only *de minimis* injury." *Id.* Prior to the Eighth Circuit's opinion in *Chambers v. Pennycook*, 641 F.3d 898 (2011), it had been an "open question in this circuit whether an excessive force claim requires some minimum level of injury." *Id.* at 904.[16]

> Given the state of the law in [2006], a reasonable officer could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, his actions would not run afoul of the Fourth Amendment. A reasonable officer was permitted to assume that legal conclusion when determining how to proceed, and he is entitled to have his conduct judged according to that standard for purposes of qualified immunity.

*Id.* at 908; *see also Jones v. Clark*, Civil No. 10-510 (SRN/JJK), 2012 WL 388699, at *10-12 (D. Minn. Feb. 7, 2012) (finding officers were entitled to qualified immunity and explaining that it was not clearly established before *Chambers* that an officer who caused only *de minimis* injuries

---

[16] In *Chambers*, the Eighth Circuit held that "evidence of only *de minimis* injury" does not "necessarily foreclose[] a claim of excessive force under the Fourth Amendment." *Id.* at 906. Rather, "[t]he appropriate inquiry is 'whether *the force used* to effect a particular seizure is 'reasonable.'" *Id.* The court reasoned that "it is logically possible to prove an excessive use of *force*" may still "cause only a minor *injury*," and such claims should not be foreclosed. *Id.* Thus, although it is no longer an "open question," the holding in *Chambers* was not the established law in 2006.

could violate an arrestee's Fourth Amendment rights); *McClennon v. Kipke*, 821 F. Supp. 2d 1101, 1108 (D. Minn. 2011) (same).

Generally, a plaintiff alleges sufficient injuries where there is some long-term or permanent injury, or at least objective medical evidence to support the plaintiff's claim of injury. *See, e.g.*, *Cook v. City of Bella Villa*, 582 F.3d 840 (8th Cir. 2009) (finding the use of a Taser reasonable where the plaintiff did not allege any permanent neck or back problems); *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990) (finding that despite the plaintiff's complaints of nerve damage from being handcuffed, his claim of excessive force failed where he presented no medical records indicating he suffered any long-term injury); *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003 (8th Cir. 2003) (finding no excessive force where the plaintiff did not "present any medical records indicating she suffered from any long-term or permanent physical injury"); *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005) (finding injuries were *de minimis* where they were "at most very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions); *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006) (holding that "relatively minor scrapes and bruises" and a "less-than-permanent aggravation of a prior shoulder condition" are *de minimis* injuries); *Chambers v. St. Louis Cnty.*, Case No. 4:05CV1469SNLJ (E.D. Mo. May 11, 2009) ("Allegations of pain or injury without proof in the form of medical records, or by other objective, competent evidence, cannot prove an injury."), *aff'd*, *Chambers*, 641 F.3d at 901; *cf. Brown*, 574 F.3d at 495 (finding a genuine issue of material fact as to whether the use of a Taser was unreasonable where the plaintiff subsequently visited her physician with anxiety and problems sleeping and focusing, was prescribed anti-anxiety medication, and also visited a psychologist twice).

The record contains no evidence that LaCross suffered more than *de minimis* injuries as a result of the Taser.  The bilateral wrist contusions and complaints of pain, numbness, and tingling in his hands and wrists were related to the handcuffs, not the Taser.  The only documented "injury" from the Taser was "a couple of marks of erythema on his back."  LaCross did not complain about any injuries resulting from the Taser while at Detox, St. Luke's, or any time thereafter.  There is no allegation or evidence that the Taser left permanent marks or caused any other serious or long-lasting injury.  The use of the Taser, in and of itself, is not more than *de minimis* injury.[17]  *C.f. Cook v. City of Bella Villa*, 582 F.3d 840, 850 (8th Cir. 2009) (citing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004), for the proposition that while "being struck by a taser gun is an unpleasant experience," in the absence of evidence of long-term effects, the use of a taser alone does "not inflict any serious injury"); *Jones*, 2012 WL 388699, at *11 (finding that use of a Taser, with no permanent injuries and where the plaintiff did not seek psychological or medical attention, are of a *de minimis* nature as a matter of law); *McClennon*, 821 F. Supp. 2d at 1107-08 (citing numerous district court cases finding that use of a Taser, without evidence of permanent physical injuries, constitutes *de minimis* injuries, at most, and finding that the plaintiff's injuries from being tased were *de minimis* as a matter of law).  *But see Orsak v. Metro. Airports Com'n Airport Police Dep't*, 675 F. Supp. 2d 944, 958 (D. Minn. 2009) (noting that certain courts have "recognized that the effects of the taser are more than *de*

---

[17]     After the Eighth Circuit's decision in *Chambers*, the use of a Taser may very well constitute more than *de minimis force*—but there is no authority in this circuit that use of the Taser alone constitutes more than *de minimis injury*.  In contrast, other circuits, such as the Fourth Circuit, have found that pain itself can constitute more than *de minimis* injury.  *See Norman v. Taylor*, 25 F.3d 1259 (4th Cir. 1994).  Such a rule, however, has not been adopted by the Eighth Circuit.

*minimis*").[18]   The red marks on LaCross's back are the type of "relatively minor scrapes and bruises" that do not amount to more than *de minimis* injuries.  *See Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir. 2006).

LaCross argues that the tasing rendered him unconscious, and that loss of consciousness, by itself, is more than a *de minimis* injury.  The case he cites for support, however, is inapposite. The plaintiff in *Yates v. Disro*, No. 05-cv-0096-DRH, 2008 WL 373179 (S.D. Ill. Feb. 12, 2008), was put in a choke-hold—cutting off the oxygen to his brain and causing him to lose consciousness—resulting in the plaintiff falling to the floor and defecating on himself.  The court in *Yates* found that this loss of consciousness, cutoff of oxygen, and defecation, in the Eighth Amendment context, constituted more than a *de minimis* injury.  The injury described in *Yates* is clearly distinguishable from the injury alleged here.  LaCross cites no other cases for the proposition that loss of consciousness, with no other injury or effects and without oxygen deprivation, constitutes more than a *de minimis* injury.  More importantly, LaCross points to no evidence or documentation to substantiate his allegation that he lost consciousness.  His medical records contain no indication that LaCross was ever unconscious—rather, when LaCross arrived at St. Luke's, he was agitated, aggressive, abusive, loud, and belligerent.  His assessment from Detox indicates that LaCross denied loss of consciousness.  "Although we view the facts and any reasonable inferences in the light most favorable to [plaintiff], we cannot ignore incontrovertible evidence which clearly contradicts [plaintiff]'s allegations."  *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (citation omitted).  Even if LaCross did momentarily lose consciousness,

---

[18]      In *Orsak*, the court focused on the pain inflicted by a Taser and the force used when deploying a Taser.  Until the recent ruling in *Chambers*, however, the rule in this circuit in the Fourth Amendment context was whether the injury itself was more than *de minimis*, not whether the pain or force was more than *de minimis*.  Thus, the Court declines to follow the reasoning in *Orsak*.

there is no evidence of any long-term injury, or any injury at all, resulting from such period of unconsciousness.

In his brief, LaCross also alleges that he suffers from anxiety, panic attacks and heart palpitations resulting from the incident—although at oral argument, he identified his injuries only as loss of consciousness and the use of the Taser by itself, and made no mention of anxiety. LaCross provides no medical records to support these claims, nor does he allege that he has sought psychological or medical treatment for such conditions.  In fact, he completed a Center for Alcohol and Drug Treatment Health History Questionnaire on February 28, 2008, in which he indicated that at that time he had no depression, excessive worry or fear, panic attacks, social fears, or phobias/avoidance.  He testified during his deposition that the answers reflected on the questionnaire were true at that time.  LaCross Dep. 212:1-10.  Thus, there is no evidence to substantiate LaCross's allegations of injury.

As in *Chambers*, "[t]he officers knew there was some chance that their actions would cause only *de minimis* injury, and it was reasonable for the officers to believe that they remained within constitutional bounds if that was the result."  *Chambers*, 641 F.3d at 908.  There is no evidence that the force used here caused more than *de minimis* injury.  Thus, "given the law prevailing at the time of the incident," *id.* at 909, Officer Mark is entitled to qualified immunity. Mark's actions were not objectively unreasonable, and even if they were, LaCross has failed to show he suffered more than *de minimis* injuries.  For those reasons, the Court grants summary judgment in favor of Mark on LaCross's § 1983 claim (Count II of the Amended Complaint).

## B.  Failure to Provide Medical Treatment

LaCross alleges in his Amended Complaint that Mark delayed in bringing him to the hospital, and thus failed to provide him with medical treatment.  Am. Compl. ¶ 47.  LaCross's

claim is based on his assertion that he was apprehended around six o'clock in the evening, but was not brought to St. Luke's until around three o'clock the following morning—a delay of approximately nine hours.  As explained above, there is overwhelming and incontrovertible evidence that the encounter between LaCross and Mark did not occur until around 1:50 a.m., and LaCross arrived at St. Luke's Hospital less than half an hour later.  Less than ten minutes elapsed between when Mark began the transport to the hospital and when LaCross arrived at the hospital. No reasonable fact finder could conclude that there was an unreasonable delay between LaCross's detention and his delivery to the hospital.

Perhaps recognizing the futility of his claim, LaCross asserts for the first time in his opposition memorandum that Officer Mark omitted or misrepresented the nature of LaCross's injuries to the hospital personnel, which, according to LaCross, constituted deliberate indifference to his medical needs.  This new allegation appears nowhere in the Amended Complaint, nor is there any evidence to support it.  LaCross bases this novel theory on one erroneous statement in the St. Luke's medical record, which indicated that LaCross was apprehended while engaged in sexual activity with his girlfriend.  LaCross's attempt to capitalize on this error is misplaced.  The medical records clearly indicate that the police used a Taser on LaCross and there is no evidence that Mark misrepresented the amount of force used on LaCross to the hospital personnel.  Moreover, to establish deliberate indifference, LaCross must show that he "suffered from one or more objectively serious medical needs, and that the [] officers acted with a 'sufficiently culpable state of mind,'" i.e., "that they actually knew of, but deliberately disregarded, [plaintiff's] medical needs." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (citations omitted).  LaCross has not made any argument that he suffered from objectively serious medical needs.  He seemingly argues that the mere fact that he was brought to St. Luke's

proves that he suffered from an obvious medical need, but he has not alleged what his serious medical need was, or that such need was disregarded.  There is no argument or evidence to support an allegation of deliberate indifference.

For the reasons stated above, the Court grants summary judgment in favor of Mark on LaCross's failure to provide medical treatment claim (Count VI of the Amended Complaint).

## C.  Negligent Infliction of Emotional Distress

LaCross alleges that Mark negligently placed him in a zone of danger, causing "severe emotional and mental distress, resulting in harm and injury."  Am. Compl. ¶ 22.  This claim fails for two reasons.  First, Officer Mark is protected by official immunity.  "[U]nder Minnesota law a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion."  *Johnson v. Carroll*, 658 F.3d 819, 829 (8th Cir. 2011) (quoting *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)).  "Police officers are generally classified as 'discretionary officers' and are entitled to official immunity."  *Id.*  "An exception to that immunity 'exists if the officer acted maliciously or willfully.'"  *Id.* (quoting *Johnson v. Morris*, 453 N.W.2d at 42).  "In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'"  *Brown*, 574 F.3d at 500-01.  As explained above, LaCross has not shown that Mark violated a "known right," because it was not clearly established that on September 17, 2006, causing only *de minimis* injuries violated the law.  *See, e.g.*, *Jones*, 2012 WL 388699, at *17; *McClennon*, 821 F. Supp. 2d at 1111.  Thus, Mark is entitled to official immunity for LaCross's state law claim.

Even if Mark was not protected by official immunity, to establish a claim of negligent infliction of emotional distress, LaCross must show that he: (1) was within a zone of danger of physical impact; (2) reasonably feared for his own safety; and (3) suffered severe emotional distress with attendant physical manifestations. *K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn. 1995). "[P]roof of physical injury is [] a requirement for negligent infliction of emotional distress . . . ." *Dornfeld v. Oberg*, 503 N.W.2d 115, 118 (Minn. 1993); *see also Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560 (Minn. 1996) ("[A] plaintiff may recover for negligent infliction of emotional distress when physical symptoms arise after and because of emotional distress."). LaCross asserts that he suffers from anxiety. As previously explained, however, there is no evidence to support this assertion. In fact, there is only evidence to the contrary. LaCross has never sought treatment for any alleged "emotional and mental distress." Further, there is no evidence that LaCross suffered from any physical injury resulting from or manifestations of his alleged emotional distress.

For those reasons, LaCross's negligent infliction of emotional distress claim fails and Mark is entitled to summary judgment on this claim (Count I of the Amended Complaint).

## III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 58] is GRANTED.

2. Summary judgment is granted in favor of Defendants on all claims.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: May 14, 2012

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge